02-10-012-CR















 

 

 

COURT OF APPEALS

SECOND DISTRICT OF
TEXAS

FORT WORTH

 

NO. 02-10-00012-CR

 

 


 
 
 Sean Fox
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE 
 
 


 

 

------------

FROM THE
211th District Court OF Denton
COUNTY

------------

MEMORANDUM OPINION[1]

----------

          In this case involving sexual abuse by
a father against his young daughter, a jury convicted Appellant Sean Fox of one
count of aggravated sexual assault of a child (penile penetration of her mouth)
and one count of indecency with a child (causing her to touch his genitals) and
assessed his punishment at forty-five years’ confinement and a $10,000 fine for
the offense of aggravated sexual assault of a child and twenty years’ confinement
and a $10,000 fine for the offense of indecency with a child.  The trial court sentenced Appellant
accordingly, cumulating the two sentences. 
In two points, Appellant contends that the trial court abused its
discretion by denying his motion for mistrial based on a juror’s relationship
with a State’s witness and by admitting punishment evidence showing that
Appellant had been sexually abused when he was a child.  Because we hold that the trial court did not
reversibly err, we affirm the trial court’s judgment.

Withholding of Information By Juror

In
his first point, Appellant contends that the trial court abused its discretion
by denying his motion for mistrial when it was discovered at trial that a juror
had failed to reveal during voir dire that he was related to State’s witness
Carol Goldberg, the nurse who had performed the sexual assault examination of
the female complainant, M.F.  In the
trial court’s introductory remarks to the venire panel, the trial court
explained,

There’s one area of questioning
wherein the attorneys are allowed to give to you some specific facts or
information concerning this case, but it’s for a very—or these cases, but it’s
for a very limited inquiry.  And it will
be so that they can give you enough information that you can determine for
yourselves whether you have any personal knowledge concerning these cases,
whether you’ve heard anything about them, read anything about them, or perhaps
know any of the witnesses who may be testifying.  So for that very limited inquiry, the
attorneys may give to you some specific information concerning the facts of
these—these cases.  And that may be one
area of questioning that will take place.

In
the State’s voir dire, the prosecutor asked the venire panel,

All right.  Now I’m going to read off a list of potential
witnesses.  If you know any of the
potential witnesses or think you know any of the potential witnesses, raise
your hand, keep it up, and after I’ve finished the whole list, I’ll come talk to
you.  Make sense to everybody?

Okay. 
[M.F.], [Mc.F.], [S.F.], [J.S.], Carol
Goldberg, [K.D.], Suzy Davis, Dena Williams, Phylles Jackson, Rebecca
Truette, Lisa Martinez, Erica Hanson, Lisa Sohel, Rebecca Torres West, Jennifer
Ware, Jodi Binion, Victoria Newton, [McK.F.], [L.F.], [T.S.], Jack Grassman,
Sam Mooney, Larry Kish, Jerold Hoffee, or Angelo Guardia.  Does anybody think they know any of those
potential witnesses?

And don’t freak out and think you’re
going to be here for a month.  That’s
just a potential witness list.  We put
down everybody that could potentially be called, but if you’re over here,
you’re not going to have that many witnesses testify during the trial.

Okay. 
So nobody thinks they know any of the witnesses?  Okay. 
Congratulations.  You’re all still
qualified to serve.  [Emphasis added.]

In
the defense voir dire, the following exchange occurred:

VENIREPERSON:  I’m supposed to be on a plane Thursday
afternoon.  You really think it’s going
to take that long?

[DEFENSE COUNSEL]:  It’s hard to say.  You saw the State’s witness list.  He says he’s not calling them all.  We may have some witnesses too.  So it’s hard to say . . . . 

 

Later,
defense counsel also said, “I think [the prosecutor] did a good job of asking
if you know anybody, and Mr. Francomano[, a member of
the venire panel,] stated that I’d represented him before.”  Defense counsel then questioned the panel
members about their relationships with police officers.  Defense counsel did not otherwise address the
issue of the panel’s knowledge of the parties, the trial judge, the attorneys,
or the witnesses.

In
the State’s opening statement, the prosecutor stated,

There’s going to be a nurse, Carol Goldberg, that will tell you here in court about her
examination of [M.F.]  She’ll talk to you
about what [M.F.] told her, and she’ll tell you that there was no physical
evidence that she found, and she’ll explain to you why that was, because too
much time had elapsed.  [Emphasis added.]


Before
testimony began, many of the State’s witnesses were sworn in and placed under
the Rule; Goldberg was not among them. 
After a break during M.F.’s testimony, Goldberg testified out of
order.  Her testimony showed, among other
things, that she had been a sexual assault nurse examiner (SANE) nurse more
than ten years.  After the State passed
the witness, the trial court conducted a bench conference.  The following occurred:

[THE COURT:]  Okay. 
For the record, while this witness was on the stand, I believe one of
the jurors called the bailiff over, spoke to him, and the bailiff gave me a
note that says one of the jurors said that he knows this witness, related by
marriage.  And I just now shared that
information with counsel for the State and the defendant.

And I believe, [Defense Counsel],
you’re asking the court to speak to this juror. 
We’ll bring him in and put it on the record and find out if this would
in any way affect his ability to be fair and impartial, correct?

[DEFENSE COUNSEL]:  That, and I’d also
like to know if he’s ever talked to Ms. Goldberg about her work in
general.  I think that would be
appropriate to ask.

THE COURT:  Okay.  All right.  Do you
want to get the individual?

(Pause in Proceedings)

THE COURT:  Okay. 
Sir, you can have a seat in the jury box if you want to.

          For
the record, would you state your name.

JUROR: 
Dale Rice.

THE COURT:  Okay. 
Mr. Rice, while this last witness, Ms. Goldberg, was on the stand, I
believe you called the bailiff over and divulged to him that, in fact, you knew
Ms. Goldberg.  And the note I got said
that you were related to her by marriage. 
Is that correct?

JUROR: 
Yes, ma’am.

THE COURT:  When the State read out the witness list
during voir dire, I assume you did not hear her name or relate it.

JUROR: 
I didn’t connect the dots.

THE COURT:  Okay.  Now
knowing that she is a witness and you’ve heard part of her testimony anyway,
what I need to know from you is whether that relationship with her in any way
would affect you to a degree that you could not be a fair and impartial juror
in this case.

JUROR: 
No, ma’am, I don’t believe it will.

THE COURT:  Okay. 
And I know that the attorneys are going to want to know when you say “I
don’t believe it will,” you know yourself better than anybody here, can you
say, yes, it would, or, no, it wouldn’t?

JUROR: 
No, it won’t.

THE COURT:  And have you ever had any discussions with
Ms. Goldberg about this type of work that she does?

JUROR: 
No, ma’am, have not.

THE COURT:  And certainly no discussions
concerning this case.  Would that
be correct?

JUROR: 
That’s correct.

THE COURT:  Is there anything at all about that
relationship—and we all appreciate your honesty in bringing it up as soon as
you realized the problem.  Is there
anything at all about that relationship that you think that anyone here needs
to know that could affect your service as a juror?

JUROR: 
No, ma’am.

THE COURT:  Does the State have any other questions that
you want to ask?

[PROSECUTOR]:  No, Your Honor.

THE COURT:  [Defense Counsel], do you?

[DEFENSE COUNSEL]:  I’m sorry. 
I didn’t catch the relationship of Ms. Goldberg by marriage.  What’s the exact relationship?

JUROR: 
My—she’s my daughter’s husband’s sister.

[DEFENSE COUNSEL]:  And how many opportunities have you had to
interact with Ms. Goldberg over the past ten years?

JUROR: 
Four or five.

THE COURT:  But you’re telling the court that it’s had
nothing to do with her job or the type of information that—

JUROR: 
More family settings, family celebrations.

THE COURT:  Anything else?

[DEFENSE COUNSEL]:  Nothing further at this time.

THE COURT:  Okay.  If you’d go back with the bailiff.  Thank you very much, sir.

          (Juror
excused)

THE COURT:  Okay.

[DEFENSE COUNSEL]:  Your Honor, at this time the defense would
move for a mistrial based upon the fact that Mr. Rice certainly is one of the individuals
that I had identified as a possible strike. 
We relied upon his answer, if you will, his silence to the question
proposed by [the prosecutor], does anybody know these witnesses.  He said Carol Goldberg.  There was no response from anyone.  I believe it’s certainly reasonable to think
that I would have stricken him had I had known he was related in any way to Ms.
Goldberg, one of the State’s chief witnesses. 
I would have at least had the chance to better develop that at the time.

So I move for a mistrial or,
alternatively, move to strike Mr. Rice from the panel and proceed with 11
jurors.

. . . . 

THE COURT:  Okay. 
. . . I’m not going to do the 11 because I don’t think—I don’t think
that the law provides for that.  I just—I
don’t.

And, you know, you might—if there is
an appeal of this case, you might not be the attorney, and then I would—you
know, we’d be in a bad spot.  So I’m not
going to do that.

But as far as your position that
you’re entitled to a mistrial because you were not able to use your strikes
with that information, I know there’s case law out there on similar issues such
as this.  And I guess my position at this
point is that I’m going to deny the request at this time, but if you can
provide me some authority—I mean, let’s keep going.  If you can provide me some authority at a
later point in time in the trial that says that you would be entitled to that
mistrial, I would be more than willing to revisit that issue.

And y’all might look and see as well,
as I will.  . . . 

As
our sister court in Texarkana has explained,

          The Sixth
Amendment guarantees the right to a trial by an impartial jury.  One aspect of this constitutional right is
the opportunity to conduct “an adequate voir dire to identify unqualified
jurors.”  In Salazar v. State, the
Texas Court of Criminal Appeals held that, “where a juror withholds material
information during the voir dire process, the parties are
denied the opportunity to exercise their challenges, thus hampering their
selection of a disinterested and impartial jury.”  If the juror did not intentionally withhold
this information, that fact is nonetheless “largely
irrelevant” in determining whether the information withheld was material.  Therefore, if a situation arises where material
information was withheld by a juror during voir dire, and if the appellant’s
subsequent motion for mistrial is denied, on appeal the denial of that motion
will be reviewed for constitutional error. 
Stated differently, in such a situation, we must reverse the trial
court’s ruling on the motion for mistrial unless we are convinced beyond a
reasonable doubt that a juror’s withholding of material information did
not contribute to the defendant’s conviction or punishment.[2]

Defense
counsel is entitled to rely on the questions asked by the trial court and
prosecutor.[3]  Diligence is therefore not at issue;
materiality is.  We need not reach that
issue, however, because we are convinced beyond a reasonable doubt that the
juror’s withholding of his relationship with Goldberg did not contribute to
Appellant’s conviction or punishment; that is, we are convinced that even if
the trial court did abuse its discretion by denying the mistrial, which we do
not hold, any error would be harmless.[4]  In making this determination, our primary question
is whether there is a Areasonable possibility@ that such error
might have contributed to the conviction.[5]

Our harmless error
analysis should not focus on the propriety of the outcome of the trial;
instead, we should calculate as much as possible the probable impact on the
jury in light of the remaining record.[6]  We evaluate the entire record in a neutral,
impartial, and even-handed manner, not Ain the light most
favorable to the prosecution.@[7]

In Franklin, the trial court refused to
allow defense counsel to question a juror who did not respond in voir dire that
she knew the complainant when the juror was in fact later revealed to be the
complainant’s Girl Scout troop assistant leader.[8]  The trial court’s refusal further compounded
the constitutional violation that had occurred when the juror withheld the
information originally, and the Franklin
court relied on the trial court’s refusal in holding the constitutional error
harmful.[9]  In the case before us, however, the trial
court held a hearing during the trial on the issue of the juror’s actual bias,
as detailed above, and allowed defense counsel to question the juror about his
relationship with Goldberg.

The
prosecutor referred to the testimony of Goldberg in his opening statement:

[M.F., the complainant,] told a little
at a time because it was hard.  Well, the
police are stepping in at this point, the Carrollton police, the Allen
police.  And [M.F.] is sent for what’s
called a sexual assault nurse exam. 
That’s SANE.  There’s going to be
a nurse, Carol Goldberg, that will
tell you here in court about her examination of [M.F.]  She’ll talk to you about what [M.F.] told
her, and she’ll tell you that there was no physical evidence that she found,
and she’ll explain to you why that was, because too much time had elapsed.  [Emphasis added.]

M.F.
was the State’s first witness.  She
testified that she was eleven years old and in the sixth grade at the time of
trial.  She initially told the jury about
early sexual experiences with her father, Appellant, that occurred in Idaho and
then described three acts of aggravated sexual assault—digital-vaginal
penetration, digital-anal penetration, and penile-oral penetration that
occurred in a hospital in Collin County, Texas. 
She clarified that in her narration, she used the term “front private”
to indicate a person’s body part used to go “pee.”

M.F.
next told about visiting Appellant and her stepmother in Carrollton.  M.F. testified that on one occasion, she had
an infection on her “front private,” and her stepmother told Appellant to put
cream on it because she was leaving. 
M.F. testified that she was on Appellant’s bed, wearing just a T-shirt,
and Appellant, wearing only his boxers, put the cream on her slowly.  She stated that Appellant applied the cream
differently than her mother did it. 
After Appellant applied the medication, M.F. testified that “[they] let
it air out.  And then he asked [her] if
[she] remembered the game . . . , and [she] told him yeah.  And he asked if [she] wanted to play
it.”  M.F. testified that she told
Appellant “yeah” “because [she] didn’t know it was bad at that age.”  M.F. testified that Appellant removed his
boxers and that she and Appellant then touched each other’s “front private[s].”  M.F. stated that her little brother, Mc.F., knocked on the door, and Appellant asked him “if he
wanted to know how to play.”  M.F. then
told the jury that Appellant took Mc.F.’s pants off, they all three “sat in a
triangle kind of circle,” and each person touched the front privates of the
other two persons with his or her hand. 
M.F. testified that she had not yet begun kindergarten when this event
happened.

M.F.
then discussed another incident that happened in Carrollton.  Appellant, his wife, her son, M.F., Mc.F., and McK.F., their older
brother, were outside playing baseball and flying kites.  M.F. needed to go to the restroom, so
Appellant took her inside.  According to
M.F.’s testimony, she “was still getting the hang of” wiping herself.  Appellant wiped her after she relieved
herself, and then “[her] pants were still down to [her] knees,
and he was—he took down his pants and asked to play the game, and [she] said
okay.  And [they] were touching each
other down there.”  M.F. clarified that
they touched each other’s “front privates” with their respective hands.  M.F. testified that Appellant touched her
inappropriately many other times but that she could not remember those times
distinctly.  But she also testified that
she remembered the events that she had described for the jury very clearly.

After
M.F. told her mother about the events, M.F. spoke with Lisa Martinez at the
Collin County Children’s Advocacy Center on two separate occasions, discussing
first the events in Idaho and Collin County, and later the events in Carrollton
and Sanger.  M.F. testified that she did
not tell everything during the first interview because she “was scared and
nervous and still having trouble remembering everything.”  She said that she had watched the videotapes
of her interviews, that they were accurate, and that she had told the truth in
the interviews.  The trial court admitted
DVDs of both interviews, State’s Exhibit 10 and State’s Exhibit 11.

In
the first interview, which occurred on August 9, 2007, about twenty-six months
before trial, M.F. discussed events of indecency with a child by exposure and
indecency with a child by digital-genital contact that she stated occurred in
Idaho.  She also discussed an event that
included digital penetration of the vagina that she described as having
occurred in Collin County.

M.F.
testified before the jury that she saw a nurse (Goldberg) who examined her and
asked her questions about what had happened. 
M.F. told the jury that she had told the nurse the truth.

Goldberg
testified before M.F. was released as a witness.  Goldberg explained that she is a “sexual
assault nurse for Collin County” and works mainly out of the Collin County
Children’s Advocacy Center.  Goldberg
explained that a sexual assault nurse examiner, “called a SANE nurse . . . , is
a registered nurse who is specifically trained to do a comprehensive exam on a
sexual assault patient.”  Goldberg
testified that she received training—fifty-six classroom hours, ninety-six
clinical hours, and twenty courtroom hours—by the Office of the Attorney
General in Texas, that she had to repeat training every two years, and that she
was currently certified as a SANE nurse for both adult and pediatric
patients.  As of the time of trial, she
had been “doing exams alone out of the advocacy center” for about ten years.

Goldberg
explained that she performs one to four “nonacute” examinations every week, that she had been doing so for the last ten years, and
that in all, she had performed several hundred examinations.  Goldberg then explained the procedure:

A SANE exam is when we go to the advocacy center, we have a room that we use.  It’s called the SANE room. It’s a room filled
with teddy bears, things for children. 
We go in there and try to talk to them on their level. And it starts
with the exam being a verbal history, writing everything down they say, in
quotations.  And then a
head-to-toe assessment, looking for trauma, and a detailed genital exam.  And if there would be trauma, then we would
do a kit, a rape kit.

Goldberg
explained that a “nonacute” or scheduled examination (an examination without a
rape kit) would occur if the report of sexual assault was made more than 72–96
hours after the alleged incident.  She
also explained that the advocacy center receives referrals mainly from law
enforcement, who provide contact information for the
child so that the advocacy center can schedule appointments.

Goldberg
stated that she examined M.F. on April 8, 2008 subsequent to the advocacy
center receiving a referral from the Allen Police Department.  The evidence shows that the examination occurred
about three weeks after M.F.’s second interview at the advocacy center.  First, Goldberg obtained a verbal history
from M.F. outside the presence of her parents. 
At trial, Goldberg read aloud from the written examination report: 

Starting when I was three, my dad, Sean, one time when we
were in Carrollton or Allen, he made me massage his private part like this—in
parentheses, hand motion done.  We were
both naked, and the yellowish little thing shooted out on my private.  One time in Carrollton he put his private in
my mouth.  I told him I didn’t want him
to.  He put his finger in my bottom hole
and in my vagina hole.  He had me massage
his private, and he made me and my brother [Mc.F.] do stuff together, like he
made us touch each other’s private.

When it first started and I was
little, I told my mom.  She said, I’m going to have to talk to Dad about that.  

I said, no, don’t; I don’t want him to
go to jail.

And then it gets—it’s kind of crossed
out, but it begins saying:  I’m going to
have to call the police.

The very, very last line I’m unable to
totally read.  The quotation is ended on
the next page with, it says history continued, mom again:  She said we would get counseling and call the
police.  End of quotations.  So there’s one line that I cannot read.

After
obtaining the verbal history, Goldberg explained, she had performed a genital
examination on the child using a colposcope, which magnifies the object
observed.  M.F.’s mother was present for
the genital examination.  Goldberg noted
no trauma to M.F.’s genitals.  Goldberg
stated that in the majority of nonacute cases she saw, she would not see any
injury.  She explained that “the female
sexual organ is very, very vascular, very estrogenized,” and she likened an
injury to it to biting the inside of one’s mouth, noting that such an injury
“would maybe be red and hurt, and then 48, 72 hours later it’s totally fine.”

Goldberg
testified that M.F. told her that Appellant was the person who had assaulted
her.

On
cross-examination, Goldberg testified that she had no knowledge of any prior
SANE examinations of M.F. or any prior visits of M.F. and her mother to the
advocacy center.  She repeated that her
examination had not shown any kind of trauma, and she admitted that it also did
not show “any kind of penetration.”  On
redirect, Goldberg testified that in 80% of nonacute cases that she saw, there
was no trauma.  On cross-examination, she
admitted that there would also be no trauma if no assault had occurred.  The trial court admitted State’s Exhibit 12,
a copy of Goldberg’s medical notes and report, after Appellant stated, “No
objection, Your Honor.”

After
the trial court released Goldberg, M.F.’s second videotaped interview was
published to the jury.  In the second
interview, which occurred about six and one-half months after the first
interview, M.F. gave more details about offenses that she stated happened in
Texas.  She told Martinez that she wanted
to tell her more information about what her father had done to her and that she
had not told her everything in the first interview because she barely knew
Martinez and was in unfamiliar surroundings. 
M.F. described an event that she said happened in an Allen, Texas
hospital bathroom.  She stated that
Appellant “massaged” her private and made her “massage” his.  She told Martinez that Appellant then put his
finger in “[her] hole down there” and “up [her] butthole.”  When Martinez asked how it felt, M.F.
answered, “Painful.”  She told Martinez
that she told Appellant to stop and that she wanted her mother.  M.F. said that then he “tried to get [her] to
put [her] mouth on his privates.”  M.F.
told Martinez that Appellant said, “I’m your dad.  It’s okay.” 
M.F. told Martinez that she believed that she was five years old when
this event occurred. 

M.F.
then told Martinez about an event that had occurred in Carrollton.  Appellant applied cream to M.F.’s genitals
for medical purposes. (Her stepmother had left; he asked M.F. if she needed
help applying the cream, and she said, “Yes.”) 
M.F. told Martinez that Appellant rubbed inside the labia, slowly.  Then, M.F. lay on his bed to “let it air out
down there.”  According to M.F.,
Appellant then licked her private and directed her to put her mouth on his
private, which she did.  M.F. told
Martinez that “something shooted into [her] mouth,” that it was both soft and
hard and “tasted like boogers,” that it made her mouth feel “weird and
numbish,” that she accidentally swallowed it, and that Appellant said,
“Oopsies.”  Appellant told Martinez that
she was five and one-half or six years old when this event happened.  M.F. said that Appellant then brought in her
younger brother, Mc.F., and told the two of them “to mess around with each
other’s privates.”

She
also stated that another time, either in Sanger or Carrollton, the three of
them sat in a circle, with their lower bodies unclothed, and took turns
“hitting” each other’s privates.  She
demonstrated that the “hitting” was actually gentle tapping.  M.F. told Martinez that Appellant made them
put their mouths on each other’s privates.

M.F.
also described an incident that occurred in Appellant’s office in Sanger, which
she described as being an outbuilding on the same property as the home he
shared with his wife and stepson.  In the
office, she and Appellant were “messing around with each other’s
privates.”  She told Martinez that
something “shooted out” of his penis; he picked it up off the floor and flushed
it.

Finally,
M.F. told Martinez about an event that had happened in her stepmother’s
bathroom when the rest of the family was outside.  Appellant asked her if she “wanted to play
one of [their] games.”  She said,
“Sure.”  They both removed their pants
and undergarments.  He played “peekaboo”
with his private, and then she followed suit. 
They then “mess[ed] around with each other’s privates.” 

After
the jury saw the second videotaped interview, Martinez, a former forensic
interviewer who had interviewed M.F. both times, testified.  Martinez stated that she had been a forensic
interviewer for about five years and had conducted more than 1,200
interviews.  In response to the
prosecutor’s question regarding things she looks for in interviews that would
be helpful for others in assessing credibility, Martinez testified, 

Some things that we always try to look
for are, like, sensory details.  Sensory
details is something that they felt, something that they tasted, something that
they saw when they’re describing something, how they—what it smelled like.  Things like that are from your five senses.

A lot of the times children can tell
you how it felt to their body. So if something happened to them and they’re
able to say, you know, he touched me in my pee pee and it hurt, obviously
that’s something that leads you to believe that it’s something that they’ve
experienced when they tell you sensory details.

It’s also we’re looking for, you know,
when they’re using their own body to demonstrate.  If they’re, you know, using their hands to
show you how they were touched or what they had to do or things like that.  We’re also looking for sequential order.  If they’re telling you a story and it’s going
from, you know, what is it that happened, then what happened next, then what
happened next, that they’re able to tell you. 
Also if it’s they’re telling you A, B, C, and D, and I go from A to C and
then back to A, if they’re able to follow me on that with more focused
questions.

          Also
looking for surrounding details, if they’re able to tell me where, like, their
parent was, where their brothers were, where— who—if anyone else was around
there, who did it happen with, to describe them, things like that, of those
nature.  So we’re looking for a lot of
different things during—as the interview is going on.

Martinez
testified that M.F. provided sensory information, surrounding details, and
sequencing information, giving examples from M.F.’s interview.

Martinez
explained that time would be the most difficult concept for children in
relaying the offenses and that “most of the time, they can’t give you the
date.”  She also explained that “gradual”
or “tentative” disclosure, or when a child tells what happened but not the
whole story, is common and is the child’s way of “testing the waters” to
determine whether he is being believed and supported.  She also explained that being able to
determine what to tell, whom to tell, and when to tell gives the children “the
only sense of control that they do have.” 
According to Martinez, “Most of the time children give a lot more
details after going into therapy or after knowing that, you know, they’re going
to be supported and things like that.”

Martinez
did not know whether a SANE examination was performed on M.F. in August 2007.

M.F.
returned to the stand after Martinez’s testimony.  She testified that Appellant put his front
private in her mouth “[a]bout twice,” that one of these events happened in the
bathroom at the hospital, and that the other one must have happened in
Carrollton, even though she did not remember its details.

M.F.’s
maternal grandmother, J.S., testified that the family had gone to the Allen
hospital a little more than six years before trial.  J.S., Appellant, and three of the children,
including M.F., were in the waiting room. 
M.F. began dancing around. 
Appellant watched her.  M.F. then
said that she had to go to the restroom, and Appellant
“jumped up and said” that he would take her. 
Appellant and M.F. stayed in the restroom “for a long, long time,” which
J.S. estimated to be “at least ten minutes,” and she thought that was “[v]ery
odd.”  J.S. testified that M.F. was four
and one-half or five years old at the time of the incident, potty trained, and
able to go to the restroom on her own.

S.F.,
M.F.’s mother and Appellant’s ex-wife, testified that M.F. had told her that
the “bathtub” incident in Idaho that M.F. described for the jury (involving Appellant
playing “peekaboo” with his penis and then fondling M.F.) had happened when
S.F. was out of town.  S.F. further
testified that M.F. was approximately four to four and one-half years old when
S.F. left the children for four days in Idaho with Appellant while she visited
friends in Dallas. 

Following
S.F.’s testimony, M.F.’s former stepmother and police officers from Allen and
Carrollton testified.  The pertinent
evidence clarified that the home of Appellant and the former stepmother in
Carrollton, where M.F. alleged incidents took place, was in Denton County.

The
State elected to proceed regarding Count 1, the
aggravated sexual assault count, on M.F.’s testimony and statements in the
second videotape regarding a time at Appellant’s house in Carrollton when he
had her put her mouth on his penis. 
Regarding Count 2, causing M.F. to touch his genitals, the State elected
“to go on the offense where [M.F.] describes her and her brother [Mc.F.] being
present and all of them touching each other.”

The
trial court also admitted Defense Exhibit 1, a DVD of Mc.F.’s interview with
Martinez.  In the interview, Mc.F. stated that he thought that Appellant had molested
him but did not provide any details.  At
trial, none of Mc.F.’s testimony went to the specific
counts involving M.F.

Defense
witness Nelson Ligon, a friend of Appellant and S.F.,
testified that S.F. told him that there was physical evidence of Appellant’s
sexual abuse of M.F. and that M.F. might not be able to have babies, but S.F.
then changed her story the next month.

In
its initial closing argument, the State did not refer to Goldberg or her
testimony at all.  In its final closing
argument, the prosecutor stated,

          I want to
talk about the sexual assault nurse examination briefly.  When Carol Goldberg talked to you, she said
that this is what [M.F.] told me.  [M.F.]
gave her a picture of this man sexually abusing her, gave her a picture of what
this man had done.

          And some of you may be wondering,
well, what about physical evidence, what about tears, what about healing, what
about scars, what about that issue, what about the hymen?  If you touch the hymen, doesn’t it break,
doesn’t it pop?  She talked about that.  No, it does not.  She talked about that in over 80 percent of
cases where there has been known sexual abuse there will be no physical
evidence.  There will be no physical
findings.  That’s what we have in this
case, ladies and gentlemen.

 

Given
the entire record—the trial court’s allowing Appellant to question the juror,
the juror’s testimony that he and Goldberg never discussed her work, and the
multiple sources other than Goldberg who provided evidence of the conduct for
which Appellant was indicted—M.F.’s extensive live testimony, the forensic
videos, and the forensic interviewer’s testimony, we are convinced beyond a
reasonable doubt that the juror’s withholding of his relationship with Goldberg
did not contribute to Appellant’s conviction or punishment.[10]  We therefore overrule his first point.

Punishment Evidence of Appellant’s
Childhood Sexual Conduct

In
his second point, Appellant contends that the trial court abused its discretion
by overruling a rule 403 objection to punishment evidence showing that he “was
the victim of acts of deviate sexual intercourse when he was a child.”  We note that the trial court instructed the
jurors not to consider the extraneous acts unless they first found beyond a
reasonable doubt that Appellant had committed them.  We also note that the trial court also
admitted evidence of Appellant’s drug use and burglaries committed when he was
a teenager. 

To
the extent that Appellant complains about the evidence that his uncle sexually
molested him when he was eight years old, we note that Appellant did not object
to the evidence but in fact offered the evidence.  We therefore overrule such complaint.[11]

Regarding
Appellant’s remaining complaints about the admission of evidence that he and a
younger cousin engaged in oral and anal sex when Appellant was twelve or
thirteen years old and that at eight years old, Appellant had his four-year-old
brother put his mouth on Appellant’s penis, article 37.07, section 3(a) of the
code of criminal procedure provides,

Regardless of the plea and whether the
punishment be assessed by the judge or the jury, evidence may be offered by the
state and the defendant as to any matter the court deems relevant to
sentencing, including but not limited to the prior criminal record of the
defendant, his general reputation, his character, an opinion regarding his
character, the circumstances of the offense for which he is being tried, and,
notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence
of an extraneous crime or bad act that is shown beyond a reasonable doubt by
evidence to have been committed by the defendant or for which he could be held
criminally responsible, regardless of whether he has previously been charged
with or finally convicted of the crime or act.[12]

          In the punishment phase, evidence is
relevant if it helps the jury determine the appropriate punishment for a particular
defendant in a particular case.[13]  Admissibility of evidence at punishment is
more a matter of policy than of “logical relevance.”[14]  A defendant’s choice of tattoos can reflect
his character,[15] as can
his gang membership.[16]  Similarly, a defendant’s extraneous sexual
conduct can be probative of his character at punishment.[17] 

But
under rule 403, otherwise relevant punishment evidence may be excluded if its
probative value is substantially outweighed by the danger of unfair prejudice.[18]  Factors considered in our analysis of an
issue regarding rule 403 are (1) the probative value of the evidence; (2) the
potential to impress the jury in some irrational, yet indelible, way; (3) the
time needed to develop the evidence; and (4) the proponent’s need for the evidence.[19]

In
upholding the admission of punishment evidence that Nenno, convicted of
sexually assaulting and murdering a seven-year-old girl, patted the bottom of a
nine-year-old girl, making her feel “mad and sad,” the Texas Court of Criminal
Appeals reasoned,

As for appellant’s Rule 403 objection,
the “inflammatory” nature of the evidence is that it tended to show that
appellant was a child molester.  Showing
appellant to be a child molester was a perfectly legitimate purpose, and hence,
while the evidence was “prejudicial,” it was not unfairly so.[20]

Similarly,
here, the State legitimately could have used the evidence to demonstrate that
Appellant’s adult sexual misconduct was deeply rooted in his childhood and not
a new manifestation of his recent relapse into drug use.  Moreover, we note that the State spent less
than a page of the reporter’s record asking questions about Appellant’s
self-reported childhood sexual experiences. 
Further, in closing argument at punishment, the prosecutor did not
specifically refer to any of Appellant’s childhood sexual experiences.  The prosecutor encouraged the jury to look at
Appellant’s “actions over the years, all from when he was a child to the
present” and stated, “[l]ook at what he’s done during
his life, because your actions will show your true character.”  The prosecutor also argued, 

[W]hen you come up with a number, make sure that that
number that you come up with is something that you can go back to your
neighbors, and your community, and can say, Mr. Fox did this, this, and this,
to his daughter, and he has done these other acts in his life, and because of
all of that, we assessed his punishment at this.

Defense
counsel, on the other hand, explicitly referred to the sexual experiences in closing
argument to mitigate Appellant’s punishment:

What about his own past?  [S.F.] talked about that.  Experiences that he had of
inappropriate touching.  Didn’t
say he was at fault for that.  She didn’t
say he started the incidents with his cousin, when he’s 13, 12, 14, or the
incident with his brother when he was eight. 
Did he start the incident with his uncle when he was eight?

Is that what started some of
this?  Do we know what kind of demons
he’s been living with since he was eight years old? 

Finally,
given the jury’s knowledge of the facts of the offenses for which Appellant was
indicted and convicted, offenses committed by the adult Appellant against his
own young daughter, we cannot say that his childhood sexual experiences would
irrationally or indelibly affect the jury.

Consequently,
we hold that the trial court did not abuse its discretion by admitting the
evidence.  We overrule Appellant’s second
point.

Conclusion

Having
overruled both of Appellant’s points, we affirm the trial court’s judgment. 

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
DAUPHINOT and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 17, 2011











[1]See Tex. R. App. P. 47.4.





[2]Sypert v. State, 196 S.W.3d 896, 900 (Tex. App.—Texarkana 2006,
pet. ref’d) (footnotes and citations omitted).





[3]Armstrong
v. State, 897 S.W.2d 361, 364 n.1 (Tex. Crim. App. 1995).





[4]See
Tex. R. App. P. 44.2(a); Franklin v. State, 138 S.W.3d 351, 354 (Tex.
Crim. App. 2004);
Sypert, 196 S.W.3d at 900; see
also Uranga v. State, No. PD-0385-08, 2010 WL 4628550, at *4 (Tex. Crim.
App. Nov. 17, 2010) (noting that the issue in Uranga is juror bias and distinguishing Franklin, where the issue was, as it is in the case before us,
“what standard of harm should be applied to the denial of a mistrial based on
the juror’s withholding of material information”).





[5]See
Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g),
cert. denied, 526 U.S. 1070 (1999).





[6]Wesbrook
v. State, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), cert. denied,
532 U.S. 944 (2001).





[7]Harris v. State,
790 S.W.2d 568, 586 (Tex. Crim. App. 1989).





[8]Franklin, 138 S.W.3d
at 352.





[9]Id. at 354–57.





[10]See Tex. R. App. P. 44.2(a).





[11]See Tex. R. App. P. 33.1(a)(1); Layton v. State,
280 S.W.3d 235, 238–39 (Tex. Crim. App. 2009).





[12]Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon
Supp. 2010).





[13]Ellison v. State, 201 S.W.3d 714, 719 (Tex. Crim. App.
2006).





[14]Id.





[15]See
Conner v. State, 67 S.W.3d 192, 201 (Tex. Crim.
App. 2001).





[16]Jones
v. State, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996) (noting that evidence
of gang membership is relevant to show character), cert. denied, 522
U.S. 832 (1997).





[17]Nenno v. State, 970 S.W.2d 549, 564
(Tex. Crim. App. 1998) (holding  evidence
that Nenno, convicted of sexually assaulting and murdering a seven-year-old
girl, patted the bottom of a nine-year-old girl, making her feel “mad and sad,”
admissible at punishment as fairly prejudicial), overruled on other grounds by State v. Terrazas, 4 S.W.3d 720 (Tex.
Crim. App. 1999); Hough v. State, No.
03-01-00265-CR, 2002 WL 1025113, at *3 (Tex. App.—Austin May 23, 2002, pet. ref’d) (holding that pictures of partially naked and naked
child who was not complainant were relevant to Hough’s character, that their
prejudicial effect was small compared to the facts of the offense, and that
their probative value “correlates directly to their prejudicial value”), cert. denied, 543 U.S. 861 (2004).





[18]Tex. R. Evid. 403; Rogers v. State, 991 S.W.2d 263, 266–67 (Tex. Crim. App. 1999).





[19]Reese v. State, 33 S.W.3d
238, 240–41 (Tex. Crim. App. 2000).





[20]Nenno, 970 S.W.2d 564.